**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WILLIAM HAAS AND AKHLAQUR RAHMAN on behalf of themselves and all others similarly situated,** | Case No. 13-cv-08130 (RA) |
| **PLAINTIFF,** | **ECF Case** |
| **v.** | |
| **VERIZON NEW YORK INC.,** | |
| **DEFENDANT.** | |

## DEFENDANT VERIZON NEW YORK INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................ 2

I.    Verizon's Business and Management Hierarchy ............................... 2

II.   The Unionized Work Environment ................................................... 3

III.  Plaintiffs' Local Manager Job Duties ............................................... 4

IV.  Procedural Background ...................................................................... 14

ARGUMENT AND CITATION OF AUTHORITY ........................................... 14

I.    The Court Must Deny Plaintiffs Summary Judgment As To The HCE Exemption Because Verizon Has Demonstrated That Plaintiffs Meet This Standard .......................................................................... 15

    A.   Haas Meets the HCE's $100,000 Threshold From 2009 to Present and Rahman Meets It From 2010 To Present ................ 16

    B.   Plaintiffs' Primary Duty Includes Performing Office Or Non-Manual Work ................................................................. 17

        1.   The Evidence Establishes That Plaintiffs' Primary Duty Includes Office or Non-manual Work ......................... 18

        2.   Plaintiffs' Arguments To The Contrary Are Unavailing ............ 19

    C.   Plaintiffs Meet The Relaxed HCE Duties Inquiry ................... 24

        1.   Plaintiffs Customarily And Regularly Direct Their Technicians ................................................................. 24

        2.   Plaintiffs Perform Duties Directly Related to Management Or General Business Operations ............................... 25

II.   Plaintiffs Have Failed To Show That Summary Judgment Is Warranted As To The Executive Exemption ......................................................... 27

    A.   Plaintiffs' Primary Duty Is Management ................................. 28

    B.   Plaintiffs Customarily & Regularly Direct The Work Of Two Or More Employees ................................................................. 33

    C.   Plaintiffs' Suggestions and Recommendations on Change of Status Are Given Particular Weight ....................................... 33

III.  Plaintiffs Have Failed To Show That Summary Judgment Is Warranted As To the Administrative Exemption .............................................. 35

    A.   Plaintiffs' Work Is Directly Related To the Management Or General Business Operations of Verizon .................................. 36

    B.   Plaintiffs Primary Duty Includes The Exercise of Discretion and Independent Judgment As To Matters Of Significance ......... 37

**TABLE OF CONTENTS**
**(continued)**

**Page**

CONCLUSION.................................................................................................................. 39

# TABLE OF AUTHORITIES

Page

CASES

*Amendola v. Bristol-Myers Squibb Co.*,
  558 F. Supp. 2d 459 (S.D.N.Y. 2008)......................................................................17

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................................14

*Baldwin v. Trailer Inns., Inc.*,
  266 F.3d 1104 (9th Cir. 2001) .............................................................................25

*Baudin v. Courtesy Litho Arts, Inc.*,
  24 F. Supp. 2d 887 (N.D. Ill. 1998) .....................................................................30

*Beauchamp v. Flex-N-Gate LLC*,
  357 F. Supp. 2d 1010 (E.D. Mich. 2005)............................................................34

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
  757 F.2d 523 (2d Cir. 1985)..................................................................................20

*Burson v. Viking Forge Co.*,
  661 F. Supp. 2d 794 (N.D. Ohio 2009)................................................................31

*Clarke v. JPMorgan Chase Bank, N.A.*,
  08 Civ. 2400 (CM), 2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. Mar. 26, 2010)......................20

*Davis v. J.P. Morgan Chase*,
  587 F.3d 529 (2d Cir. 2009)............................................................................36, 37

*Donovan v. Burger King Corp.*,
  672 F.2d 221 (1st Cir. 1982)...........................................................................30, 31

*Donovan v. Burger King Corp.*,
  675 F.2d 516 (2d Cir. 1982)...........................................................................32, 39

*F.D.I.C. v. Wrapwell Corp.*,
  No. 93 CIV 859 (CSH), 2002 WL 14365 (S.D.N.Y. Jan. 3, 2002) ........................................20

*Gonzalez v. McNeil Techs., Inc.*,
  No. 1:06cv204, 2007 U.S. Dist. LEXIS 27262 (E.D. Va. Apr. 11, 2007)........................16, 17

*Grace v. Family Dollar Stores, Inc.*,
    845 F. Supp. 2d 653 (W.D.N.C. 2012) ...............................................................31

*Harper v. GEICO*,
    No. 13–4479–cv, 2014 WL 5066492 (2d Cir. Oct. 10, 2014) ................................39

*Hicks v. Mercedes-Benz U.S. Int'l Inc.*,
    7:08-cv-0536-LSC, 2012 U.S. Dist. LEXIS 91253 (N.D. Ala. July 2, 2012) ........25

*Hicks v. Mercedes-Benz U.S. Int'l, Inc.*,
    No. 7:08-CV-0536-LSC, 2012 U.S. Dist. LEXIS 60221 (N.D. Ala. April 30,
    2012)
    ...........................................................................................................19, 22, 24, 25

*Hicks v. Mercedes-Benz U.S. Int'l, Inc.*,
    No. 7:08-CV-0536-LSC, 2012 U.S. Dist. LEXIS 91969 (N.D. Ala. July 3,
    2012) ....................................................................................................................22

*Hicks v. Mercedes-Benz United States Int'l, Inc.*,
    7:08-cv-0536-LSC, 2012 U.S. Dist. LEXIS 93708 (N.D. Ala. July 6, 2012) ........26

*In re Novartis*,
    611 F.3d 141 (2d Cir. 2010) .................................................................................39

*Johnson v. Big Lots Stores, Inc.*,
    604 F. Supp. 2d 903 (E.D. La. 2009) ...................................................................33

*Mack v. United States*,
    814 F.2d 120 (2d Cir. 1987) .................................................................................20

*Mayne-Harrison v. Dolgencorp, Inc.*,
    No. 1:09-CV-42, 2010 WL 3717604 (N.D. W.Va. Sept. 17, 2010) .......................29

*Perkins v. Southern New England Tel. Co.*,
    No. 3:07-CV-967 (JCH), 2012 U.S. Dist. LEXIS 18943 (Feb. 14, 2012).............29

*Pieretti v. Dent Enters.*,
    No. 11-2179, 2013 U.S. Dist. LEXIS 27244 (E.D. Pa. Feb. 27, 2013) ...........26, 37

*Pippins v. KPMG*,
    759 F.3d 235 (2d Cir. 2014)..................................................................................39

*Pippins v. KPMG LLP*,
    921 F. Supp. 2d 26 (S.D.N.Y. 2012).....................................................................33

*Puentes v. Siboney Contracting Co.*,
    No. 11-80964-CIV, 2012 WL 5193417 (S.D. Fla. Oct. 19, 2012) ........................................26

*Ramos v. Baldor Specialty Foods, Inc*,
    10 Civ. 6271(RMB), 2011 WL 2565330 ..................................................25, 28, 30

*Rooney v. Town of Groton*,
    577 F. Supp. 2d 513 (D. Mass. 2008) ..........................................................................37

*Savage v. Unite Here*,
    No. 05 Civ. 10812 (LTS)(DCF), 2008 U.S. Dist. LEXIS 32219 (S.D.N.Y.
    Apr. 17, 2008) ................................................................................................................18

*Scott v. SSP Am.*,
    09-CV-4399 (RRM) (VVP), 2011 U.S. Dist. LEXIS 32819 (E.D.N.Y. Mar.
    29, 2011) ................................................................................................................ passim

*Switzoor v. SCI Eng'g, P.C.*,
    No. 11 Civ. 9322 (RA), 2013 U.S. Dist. LEXIS 129994 (S.D.N.Y. Sept. 11,
    2013) ......................................................................................................................23, 24

*Wade v. Werner Trucking Co.*,
    No. 2:10-CV-270, 2014 WL 1091707 (S.D. Ohio March 18, 2014)......................................26

*Wilbur v. Silgan Containers*,
    No. 2:06-CV-02181-MCE-EFB, 2008 U.S. Dist. LEXIS 72804 (E.D. Cal.
    Aug. 18, 2008) ..............................................................................................................30

*Williamson v. Cook Composites & Polymers Co.*,
    No. CV 08–8069 AHM, 2009 WL 4730887 (C.D. Cal. Dec. 7, 2009) ................................37

*Zubair v. EnTEch Eng'g P.C.*,
    808 F. Supp. 2d 592 (S.D.N.Y. 2011).............................................................................23, 24

## STATUTES

29 U.S.C.S § 207.............................................................................................................16

National Labor Relations Act, 29 U.S.C. § 152(3)...........................................................3

Fair Labor Standards Act ......................................................................................... passim

New York Labor Law ............................................................................................... passim

**OTHER AUTHORITIES**

29 C.F.R. § 541.100 ......................................................................................................28, 33

29 C.F.R. § 541.102 ...........................................................................................................28

29 C.F.R. § 541.105 ......................................................................................................34, 35

29 C.F.R. § 541.200 ...........................................................................................................36

29 C.F.R. § 541.201 ......................................................................................................26, 36

29 C.F.R. § 541.202 ......................................................................................................38, 39

29 C.F.R. § 541.203 ...........................................................................................................39

29 C.F.R. § 541.601 ...............................................................................15, 16, 17, 19, 24

29 C.F.R. § 541.700 ..................................................................................................28, 31, 33

29 C.F.R. § 541.703 ..................................................................................................23, 28, 29

29 C.F.R. § 778.211 ......................................................................................................16, 17

N.Y. Comp. Codes R. & Regs. § 142-2.2 ...........................................................................15

## INTRODUCTION

Plaintiffs William Haas ("Haas") and Akhlaqur Rahman ("Rahman") (collectively "Plaintiffs") are each responsible for managing a team of approximately 23 unionized technicians who perform manual installation and maintenance work.  Critical to Defendant Verizon New York's ("Verizon's") success, Plaintiffs hold their technicians accountable for meeting quality, efficiency, safety, and customer service objectives.  In doing so, Plaintiffs continually assess their technicians' performance, decide how to address deficiencies, and complete technicians' mid-year and year-end performance appraisals.  They motivate and coach their technicians, ensure their technicians receive the proper amount of work, and reapportion work as necessary, to meet Company objectives.  They direct the work of their technicians throughout the day by, for example, answering questions that arise in the field and authorizing deviations from planned jobs as necessary.  All along, Plaintiffs administer Verizon's policies and procedures.  Because they are closest to the technicians, the Company relies on Local Managers, including Plaintiffs, to initiate the disciplinary process when technicians violate those policies and procedures, suspend technicians on the spot for egregious behavior, and otherwise provide input and recommendations to disciplinary decisions.  This is essential in a unionized work environment because technicians often grieve the discipline they receive, which can lead to arbitrations under Verizon's collective bargaining agreement with the union. Where possible, Plaintiffs are expected to resolve complaints before they reach the formal grievance process, but when it is initiated, Plaintiffs serve as the "management spokesman" of the Company at the first step.  Plaintiffs are well-paid for their work:  Haas has earned in excess of $100,000 in the years 2009 to present, and Rahman has earned in excess of $100,000 in the years 2010 to present.

Notwithstanding overwhelming evidence in the record of their managerial role, including their own statements, both before and during this litigation, Plaintiffs claim that they are entitled

to summary judgment on their Fair Labor Standards Act ("FLSA") and New York Labor Law

("NYLL") overtime claims because they do not meet the FLSA's highly compensated employee

("HCE"), executive, or administrative exemptions.  *See* Plaintiffs' Memorandum Of Law In

Support Of Motion For Partial Summary Judgment ("Motion") (Dkt. No. 102).  The evidence

clearly establishes that Plaintiffs satisfy all three exemptions,[1] but at the very least the record

reflects genuine issues of disputed material fact as to each and every element of all three

exemptions.  Accordingly, Plaintiffs' Motion must be denied.

## FACTUAL BACKGROUND

**I.  Verizon's Business and Management Hierarchy**

Verizon provides voice, internet and television services to residential and business

customers.  (Deposition of Akhlaqur Rahman ("Rahman Dep.") 11:11-12:13.)[2]  Haas and

Rahman are currently employed by Verizon in title of Local Manager I&M/Construction ("Local

Manager").  (Deposition of Plaintiff William Haas ("Haas Dep.")[3] 4:24-5:6; 9:10-11; Rahman

Dep. 9:6-22.)  Plaintiffs' primary duty is to manage a team of unionized technicians, who

perform manual installation and repair work.  (Deposition of Colin Lashley ("Lashley Dep.")[4]

23:4-21; Declaration of Colin Lashley ("Lashley Dec.") ¶¶ 5, 18-23.)

Since 2007, Plaintiffs' teams have ranged from between 15 and 23 technicians.  (Haas

Dep. 54:21-55:13; Rahman Dep. 30:14-31:8; 80:24-81:24.)  Plaintiffs are based out of Verizon's

Hollis garage located in South Queens.  (Haas Dep. 46:22-47:7; 97:11-23; Rahman Dep. 37:16-

25.)  Haas and Rahman report to Area Manager Colin Lashely ("Lashley"), who, in turn, reports

to Director John Quadrino ("Quadrino").  (Haas Dep. 126:24-128:24.)   A total of 131

---

[1] Verizon has moved for summary judgment as to the HCE exemption.  (Dkt. No. 106.)

[2] The deposition testimony of Akhlaqur Rahman is attached as Exhibit A to the Declaration of Tonya Braun ("Braun Declaration" or "Braun Decl."), filed concurrently herewith.

[3] The deposition testimony of William Haas is attached as Exhibit C to the Braun Declaration.

[4] The deposition testimony of Colin Lashley is attached as Exhibit E to the Braun Declaration.

technicians roll up through six Local Managers to Lashley.  (Haas Dep. 129:17-132:15; Haas Dep. Ex. 2.)[5]  Plaintiffs largely perform their work outside the presence of Lashley who spends "very little time" in the field with the technicians and has "never" addressed the technicians as a group.  (Rahman Dep. 245:16-246:8; Haas Dep. 233:19-235:5.)  Lashley and four other Area Managers report to Quadrino.  (*Id.*)  A total of 701 technicians roll up under Quadrino. (*Id.*)

## II.    The Unionized Work Environment

The technicians are represented by the Communication Workers of America ("CWA"). (Haas Dep. 87:4-88:10; Rahman Dep. 25:14-26:15.)  As in all unionized workforces, a divide exists between management and the unionized technicians as reflected by the collective bargaining agreement ("CBA") between Verizon and the CWA.  (*See* Lashley Dec. ¶¶ 6, 14.) This is the case because, pursuant to the National Labor Relations Act, "supervisors" cannot be a part of the bargaining unit.  *See* 29 U.S.C. § 152(3) ("employee" shall not include "any employee employed as a supervisor").  Accordingly, Local Managers, who are not in the bargaining unit, are prohibited from performing the same work as the technicians.  (Lashley Dec. ¶ 7; Lashley Dep. 111:13-25; 138:4-23; *see also* Haas Dep. 171:15-172:17; Rahman Dep. 26:23-27:5 (admitting that they do not perform the same work as their technicians).)

Due to this management/unionized technician dichotomy, the relationship has been contentious at times.  (Lashley Dec. ¶ 14.)  For example, technicians routinely file grievances regarding discipline they receive.  (*Id.* at ¶ 9.)  The union's right to demand costly and time consuming arbitration with respect to unresolved grievances, which it often does, underscores Verizon's responsibility to carefully investigate and ensure consistency before finalizing disciplinary and termination decisions.  (*Id.* at ¶¶ 9, 33.)  Local Managers' role in the disciplinary and grievance process is significant because they are the individuals closest to the technician and

---

[5] All exhibits from Haas' deposition cited herein are attached as Exhibit D to the Braun Declaration.

behavior at issue.  (Lashley Dec. ¶ 31, 34.)  As a result, they are in the best position to identify

infractions and initiate the disciplinary process.  (*Id.* at 31).  Furthermore, because Local

Managers conduct the disciplinary investigations (interviewing technicians and making a report),

they are in the best position to assess what occurred and to make a corresponding

recommendation. (*Id.* at ¶¶ 33-34.)

      The tension in the collective bargaining relationship has resulted, at times, in technicians

going out on strike.  (Lashley Dec. ¶ 14.)  When this occurred most recently, Verizon disciplined

employees for strike misconduct, resulting in the union filing unfair labor practice charges.  (*Id.*)

As the immediate supervisors of technicians, Local Managers served as pivotal witnesses on

behalf of the company in these proceedings before the National Labor Relations Board. (*Id.*)

## III.     Plaintiffs' Local Manager Job Duties[6]

      Plaintiffs' most important duty is to manage their team of technicians and, in particular,

"drive [their] performance."  (Lashley Dep. 23:4-21; 50:9-51:2; 209:11-210:7; Lashley Dec. ¶¶ 5,

16-18, 21.)  Indeed, from the outset of this litigation, Plaintiffs have admitted that their job is to

"oversee" a team of technicians.  (Dkt. No. 1, Complaint ¶ 43 ("[Plaintiffs] oversee a crew of

technicians who go out into the field and perform installation and maintenance for [Verizon's]

customers.")  For example, according to Plaintiffs, they ensure that their technicians meet

"scorecard objectives" regarding "productivity, quality . . . customer experience and safety."

(Rahman Dep. 86:13-87:3; 135:4-138:22.)  Moreover, Rahman identified such managerial work

as Local Managers' "primary duty." (Rahman Dep. 138:8-22.)

      Plaintiff are "graded on" their technicians' degree of success in meeting their objectives.

(Rahman Dep. 135:4-138:22.)  Accordingly, they continually assess their technicians'

performance to keep them on track and hold them accountable.  (Haas Dep. 106:12-107:9; 120:4-

---

[6] Plaintiffs have had similar duties from 2007 to present.  (Haas Dep. 43:7-44:2; Rahman Dep. 37:10-15.)

121:3; Rahman Dep. 185:13-188:10; 237:19-278:8 Lashley Dec. ¶ 19.)  Determining areas for improvement and the "right formula to motivate their teams" is central to a Local Manager's success and the overall success of the company.  (Lashely Dep. 209:11-210:7; Lashely Dec. ¶ 21.)  Safety and quality work observations are an important management tool in this regard.  (Lashley Dec. ¶ 22.)  Plaintiffs evaluate their technicians' work with the aid of a checklist to identify areas for improvement and, using their discretion, determine whether to address an issue in "real time," or otherwise coach a technician for improvement regarding an observed deficiency.  (Lashley Dep. 29:20-36:4; 38:22-42:2; Lashley Dep. Ex. 1;[7] Lashley Dec. ¶¶ 24-25.; Rahman Dep. 62:9-16; 69:24-71:23.)  Although necessary to give feedback to hold technicians accountable (Lashley Dep. 38:22-42:2; Lashley Dec. ¶ 22), the observations serve the additional purpose of keeping technicians and customers safe and ensuring that Verizon provides a quality product (Lashley Dep. 38:22-42:2; Lashley Dec. ¶ 23).

Plaintiffs' job is to do "whatever as managers they feel is necessary to move that technician from noncompliance to compliance." (Lashley Dep. 38:24-42:2. )  More specifically, after identifying the deficiency, Plaintiffs use their managerial discretion to determine whether the cause is a training issue or a behavior issue and the steps they will take to improve the technician's performance.  (Lashley Dec. ¶ 19.)  For example, they may explain how to perform the task, refer the technician for additional training, or initiate disciplinary action.  (*Id.* at ¶ 25.)  If the initial plan does not work, Plaintiffs decide upon another approach.  (*Id.* at. ¶ 19.)  For their lowest performing technicians, Plaintiffs sometimes formalize this process by mapping out a performance improvement plan.  (*Id.* at ¶ 20; Ex. D.)

Plaintiffs manage their technicians' performance by informing them as to how they stand in relation to the scorecard metrics, letting them know what will occur if they do not improve

---

[7] All exhibits from Lashley's deposition cited herein are attached as Exhibit F to the Braun Declaration.

their results, and taking steps to improve their technicians' performance.  (Haas Dep. 119:11-121:3; Rahman Dep. 90:10-93:16.)  Haas reviews reports on jobs completed in a day (Haas Dep. 107:21-108:7) and timeliness of departure to the field (Haas Dep. 113:4-114:11); completes technician work observations (Haas Dep. 114:12-25); posts team results on a daily basis (Haas Dep. 115:2-22); and individually meets with technicians on a monthly basis to review their "scorecard" results (Haas Dep. 117:8-118:8).  Rahman "develop[s]" his technicians' performance by  "mak[ing] sure the techs are performing" through work observations (Rahman Dep. 32:8-33:7; 185:13-188:10); ensures that they have received a full day's worth of job assignments; communicates with the dispatch center regarding work assignments as necessary; and monitors whether his technicians leave the garage by 8 a.m. (*id.* at 32:8-33:7).

Each day, Plaintiffs ensure that technicians have the right amount and type of work and move work based upon technician call offs or problems with jobs loading properly in the system. (Lashley Dec. ¶ 42.)  They also direct the work of their technicians throughout the day. (*Id.* ¶¶ 43-44.)  This requires Plaintiffs to monitor job progress and work with dispatch to reapportion work as necessary to meet customer commitments.  (*Id.* at ¶ 43.)  In so doing, they have the authority to authorize incidental overtime as necessary.  (*Id.* at ¶ 43; Ex. M.)  They further answer technicians' calls regarding issues encountered in the field and to provide authorization for technicians to deviate from planned jobs or receive additional assistance.  (*Id.* at ¶ 44.)

As Haas testified, he is responsible for monitoring whether his technicians go straight to their first job; making sure that they take an hour-long lunch break; and whether they return to the garage as scheduled.  (Haas Dep. 151:19-152:8.)  Throughout the day, Haas further directs his technicians regarding the proper procedures to follow, such as what to do when they have completed their work for the day.  (Haas Dep. 172:18-173:14.)  In fact, his technicians are required to notify him, and Haas must approve, any deviations from a job.  (Haas Dep. 172:18-

173:14; 223:16-23; 259:24-260:4.)  Haas' technicians also are required to report to him on

matters such as whether they will be late or absent and the reason why, as well as instances in

which they will be late reporting to a job or untimely in completing a job.  (Haas Dep. 304:23-

306:14.)  In such instances, Haas may decide to direct a technician to assist another technician in

order to complete work in a timely manner.  (*Id.* at 309:22-310:13; Lashley Dep. 100:20-101:20;

59:25-61:16)  Haas' technicians also call him to ask how to approach difficult customers and

how to handle a situation they have not previously encountered.  (Haas Dep. 259:24-262:8.)

Rahman similarly testified to directing his technicians' work by addressing with them anything

he observes that is either unsafe or presents an issue related to the quality of the service being

provided.  (Rahman Dep. 62:9-16; 69:24-71:23.)  He answers questions from his technicians that

arise in the course of their work (Rahman Dep. 73:12-75:19; 159:21-160:4) and directs them

how to proceed if, for example, they will not complete a job within a certain period of time

(Rahman Dep. 122:25-124:8; Lashley Dep. 100:20-101:20; 59:25-61:16).

Plaintiffs also enforce a number of policies, procedures, and work rules, including the

Safety Action Plan, Code of Conduct, and other "work rules."  (Rahman Dep. 163:4-7; Haas

162:24-163:4; *see also* Lashley Dec. ¶ 30; Ex. N).  For example, on a daily basis, Plaintiffs

ensure that technicians are on the job as they are supposed to be (not taking any side trips or

sleeping on the job) (Lashley Dep. 104:20-107:4); performing their jobs safely (Lashely Dep.

38:22-42:2); following the "tech call through" policy (Lashely Dep. 23:22-27:17); and

identifying instances of potential absence fraud (Lashley 162:1-163:10).

As the manager closest to their technicians, Plaintiffs are in the best position to identify

violations of policy.  (*Id.* at ¶ 31.)  If the conduct is particular egregious, they have the authority

to suspend technicians on the spot.  (*Id.* ¶¶ 35; Haas Dep. 157:8-22)  For example, in

administering the Code of Conduct, Haas has suspended technicians without pay and without

prior approval based upon their behavior in the workplace. (Haas Dep. 154:15-169:11; 169:12-173:6, Haas Dep. Ex. 6; Lashley Dec. ¶ 36; Lashley Dec. Exs. H, I; Lashley Dep. 42:24-43:9; 251:12-252:7.)   On more than one occasion, the suspension was lengthened based upon Haas' input regarding the severity of the technician's behavior.  (Haas Dep. 166:8-169:11; 163:7-166:20; 154:7-158:11; Haas Dep. Ex. 6, Lashley Dec. Ex. H.)

When Plaintiffs initiate the disciplinary process, they play a vital role by investigating incidents, making recommendations regarding the severity of discipline (including the length of a suspension), and whether it will withstand scrutiny in the grievance process. (Lashley Dec. ¶¶ 33-34; *see also* Haas Dep. 185:19-188:14 (admitting that he "opines" whether the case is "strong"); Rahman Dep. 161:3-163:7; Lashley Dec. Ex. G, at VZ011631 ("I am looking to suspend [technician] at least a day;" VZ020137 ("I am looking to suspend [technician] for at least a day for his accident on 8/9/2013.")). Because technicians often grieve the discipline they receive (which could lead to arbitration), the interviews, conclusions, and recommendation that Plaintiffs make are carefully considered.   (Lashley Dec. ¶ 34.)  In particular, Plaintiffs interview the technician, determine how to elicit the necessary information, identify the need for follow-up, if necessary, and prepare a "package" of information including their interview summaries and conclusions drawn regarding the technician's conduct.  (*Id.* ¶ 33.)  With 130 technicians in the Hollis garage, Area Manager Lashley is dependent upon Plaintiffs (and other Local Managers) to provide a clear view of the facts along with their insight regarding the relevant background regarding the technician, his/her past performance, and any extenuating circumstances.  (*Id.*; *see also* Haas Dep. 213:3-214:2; Rahman Dep. 161:6-165:10; 199:16-202:7; 209:9-211:21; Lashley Dec. Exs. E, F (summarizing Rahman's 2012 disciplinary record), H-I; Rahman Dep. Exs. 11, 13; [8] Haas Dep. 154:15-169:11; Haas Dep. Ex. 6.)

---

[8] All exhibits from Rahman's deposition cited herein are attached as Exhibit B to the Braun Declaration.

Not surprisingly, given their role in discipline, Plaintiffs also have an important role in handling technicians' grievances regarding discipline and other issues. (Lashley Dec. ¶ 40.) Plaintiffs first consider whether a complaint may be resolved before it becomes a formal grievance. (*Id*.) If a grievance is filed, Local Managers typically are the only level of management present at the first step meeting and act as the company representative. (Lashley Dec. ¶ 11; Haas Dep. 193:6-15; Rahman Dep. 116:3-118:15.) Indeed, Rahman admitted that he has handled "hundreds" of grievances (Rahman Dep. 116:25-117:3), and Haas has been praised for being "instrumental" in the grievance process (*See* Haas Dep. Ex. 11, at VZ001091; Haas Dep. Ex. 12, at VZ001093 (noting that Haas "continues to handle all union related issues in the work center"); Haas Dep. Ex. 13, at VZ001095 (same); Haas Dep. Ex. 14, at VZ001113 ("Bill is the Labor SME and sits with me at second step grievances"). Plaintiffs are expected to resolve grievances as appropriate at the first step of the grievance process. (Lashley Dec. ¶¶ 9-12; Ex. L.)

Local Managers' conduct year-end performance appraisal ratings of their technicians. (Lashley Dec. ¶¶ 13, 45; Haas Dep. 106:12-107:9.) These appraisal ratings can be of great significance to a technician because, without a satisfactory rating, he/she is prohibited from applying for a transfer or promotion. (Lashley Dec. ¶ 13; Lashley Dec. Ex. A, at VZ000224-225; Ex. B, at VZ032482) (CBA 44.02 – Administrative Procedures: "Employees with an overall evaluation rating of satisfactory on their appraisal and who are satisfactory in attendance and punctuality at the time of job award will be eligible to apply for placement."). Local Managers also provide input regarding technicians in the promotion consideration process. (*See* Deposition of John Quadrino ("Quadrino Dep.") 48:24-49:22.)[9]

Plaintiffs' managerial responsibilities are plainly reflected in and confirmed by the performance appraisals that they themselves receive. (Lashley Dec. ¶ 47.) Each Plaintiff is

---

[9] The deposition testimony of John Quadrino is attached as Exhibit G to the Braun Declaration.

evaluated on, among other things, the extent to which he (1) "Sets and communicates objectives,

manages the work, directs the employee, and conducts a year-end formal review to assess the

contribution to the business;" (2) "Provides regular and ongoing performance feedback, training

and development and takes appropriate action when employee does not meet performance

standards;" and (3) "Places employee on performance improvement, recommends and

administers discipline as appropriate." (Rahman Dep. 265:21-268:6; Lashley Dec. Ex. Q, at Haas

000373-374: *see also* Haas Dep. 220:18-221:24; Lashley Dec. Ex. O (similarly defining

supervisor responsibilities for 2014 appraisal process)).  By way of example, Haas has been

recognized for "show[ing] that he was willing to hold people accountable for their actions and

dell [sic] out discipline when necessary" (Haas Dep. Ex. 11, at VZ001091), and being "very

enthusiastic about making sure his associates put in an honest days [sic] work"  (Haas Dep. Ex.

14, at VZ001113).  Rahman similarly has been praised for giving "on-going feedback on

[technicians'] progress and work[ing] closely with his team to meet Verizon's established

performance standards" (Lashley Dec. Ex. Q, at Haas000374), as well as holding "his

technicians accountable where necessary throughout the year" (*id.* at Ex. P, at Haas000367).

Tellingly, although the appraisal process allows for Local Manager's comments, Plaintiffs have

never disagreed with the criteria upon which they are evaluated or disputed their evaluations.

(*See e.g.*, Lashley Dec. ¶ 47; Ex. O,  at VZ 001167; Ex. P., at Has00371; Ex. Q, at Haas000377.)

Job requisitions for the Local Manager position provide an overview of Plaintiffs'

managerial responsibilities.  (Lashley Dep. 90:17-91:10; Lashley Dec. ¶ 17.)  In fact, after

initiating the instant lawsuit, Rahman provided a professional resume developer with a "recent

job posting" that he said would "provide [his] current job description."  (Deposition of Ellen

O'Brien ("O'Brien Dep.")[10] 44:4-45:13; O'Brien Dep. Ex. 4.)[11]  The posting states that Local

---

[10] The deposition testimony of Ellen O'Brien ("O'Brien") is attached as Exhibit H to the Braun Declaration.

Managers, in their "managerial role," are "[r]esponsible for supervising a team of employees including planning work and dividing it among employees; training, coaching & counseling employees, directing the work of employees; managing the performance of the employees including setting objectives, assessing performance, placing employees on performance improvement plans, and recommending disciplinary action."  (O'Brien Dep. Ex. 4, at Haas 000379).  The posting further notes that Local Manager candidates "must ensure they can lead a team" and "require strong leadership skills, innovative and creative abilities to identify and implement changes to improve business results." (*Id.*)  Importantly, Local Manager candidates also "must possess the ability to interpret [the] current labor agreement [CBA] and negotiate through the grievance procedure." (*Id.*)  The job posting further notes, that "[c]andidate[s] [are] responsible for administering the Verizon processes and policies as they relate to Safety, Attendance, Performance Work Results and Codes of Conduct." (*Id.*)

Verizon provides management-specific training to its Local Managers to prepare them for their management responsibilities.  (Lashley Dec. ¶ 48.)  In this regard, Haas has completed courses on the "Fundamentals of Labor Relations," "Workbrain Time and Attendance for Supervisors;" "Supervisor Responsibilities Under the Americans with Disabilities Act (ADA);" "Supervising Overtime-Eligible Associates;" and "Leadership Fundamentals."  (Haas Dep. 253:9-255:9; Haas Dep. Ex. 21, at VZ00875-876.)

Plaintiffs' resumes further demonstrate their managerial role and provide specific highlights.  For example, Haas' original resume, which he admits to authoring prior to initiating this lawsuit, states that he is a Field "Manager" with the following key responsibilities: "Supervise 25 man Fiber Optic Installation and Repair crew; Training Program Manager; Labor

---

(continued…)

[11] All exhibits from O'Brien's deposition cited herein are attached as Exhibit I to the Braun Declaration.

Relations Coordinator." (Haas Dep. 294:21-297:4; Haas Dep. Ex. 22).  After Haas sought

assistance to improve his resume for purposes of potentially submitting for a position at Avis

(Haas Dep. 323:3-11), his resume stressed the results of his managerial work and impact on

Verizon's operations through the following accomplishments:  "[r]esponsible for general

operations management of regional workforce generating $3.0M annual revenue, as well as, end

to end administrative management of technical capabilities, training and workforce

productivity;" "[d]elivered exceptional workforce optimization performance"; and "[i]ncreased

workforce operating productivity to 115% outpacing overall business by 30% and contributing

$1.0M to profit."  (Haas Dep. Ex. 24.)

  For his part, earlier this year, Rahman hired a professional resume preparer, Ms. Ellen

O'Brien, to assist him in developing a resume.  (Rahman Dep. 78:23-79:12; 83:25-84:14;

O'Brien Dep. 8:2-25; 9:16-18; 13:14-16.)  Understandably, as a professional guided by "her own

value and belief system" and with an interest in protecting her personal reputation and that of her

business, O'Brien does not "know how to [prepare a resume] if not in a fair light."  (O'Brien

Dep. 10:11-19.)  To ensure that is the case, O'Brien "ask[s] upfront" that her clients provide "an

accurate representation and a reflection of what they do" and utilizes an "interactive process

throughout" to confirm accuracy.  (*Id.* at 11:1-7.)

  O'Brien followed this same process with Rahman (O'Brien Dep. 35:5-36:21), meeting

with him on several occasions over a six to eight week period, by phone and in person, so that

Rahman could explain his job duties (*id.* at 33:4-34:6).  To obtain additional duties-related

information, O'Brien also asked Rahman to provide her with performance appraisal documents,

and he complied.  (*Id.* at 29:16-30:10; 31:18-32-23.)  Based upon the information Rahman

provided, O'Brien had "a good grasp on the way that [Rahman] viewed the way he performed

his job." (*Id.* at 49:17-50:16.)  From their collaboration, O'Brien created two versions of a

resume to prepare Rahman for his next career move. (Rahman Dep. 76:17-79:12; 83:25-84:4; Rahman Dep. Exs. 1 and 2; O'Brien Dep. 19:14-20:14; 29:6-15; 27:21-24.)  At no point did Rahman raise a concern that the documents he chose to provide (O'Brien Dep. 45:9-47:21), or the resume being developed (*id.* at 35:5-36:21), was inaccurate in any respect.  To the contrary, Rahman told O'Brien that he was pleased with the final product and paid her $325 for her work. (*Id.* at 26:17-27:24; O'Brien Dep. Ex. 1.)

The resumes highlight Rahman's managerial duties and additional project responsibilities related to increasing the efficiency of Verizon's business operations.  (*See* Rahman Dep. Exs. 1 and 2.)  With respect to management contributions, Rahman's resume indicates that he "[l]ead[s] [a] team of 22 union-represented technicians;" "consistently deliver[s] on business targets for productivity (core and repeater), quality, customer service, and safety;" and "manage[s] individuals' and team performance; recognize[s] jobs well done; coach[es] and develop[s] for improvement, write[s] and deliver[s] performance appraisals, appl[ies] and advance[s] discipline appropriately, addresses[es] grievances, listen[s] [and] clearly and regularly communicate[s] expectations." (*Id.*)  It also showcases his direct involvement in the creation of a "call back" program that both "improved customer quality and lower[ed] costs to the business." (*Id.*)

Consistent with statements in both of their resumes, Plaintiffs concede that their work is directly related to the success of Verizon's business operations, in particular, by "mak[ing] sure the techs are performing" consistent with company standards.  (Rahman Dep. 32:8-33:7; Haas Dep. 114:12-116:23; 106:12-109:24; 120:4-121:3.)  They accomplish this, in part, by completing the work observations of their technicians.  (Rahman Dep. 32:8-36:2.)  But this work has significance beyond the individual technicians being reviewed.  (Lashely Dec. ¶¶ 21, 23.)  For example, as Plaintiffs recognize, they complete safety compliance observations to ensure "the employees' health, [the] public's health, [the] customer's health, and ultimately the company's

well-being as well." (Rahman Dep, 58:6-59:20; Lashley Dep. 39:24-41:7; Lashley Dec. ¶ 23.)

Similarly, they perform quality observations to ensure that the company provides "good

customer service" consistent with the company's quality standards. (Rahman Dep. 67:10-68:10;

Lashley Dec. ¶ 23.)  In sum, Plaintiffs' observations regarding safety and quality objectives serve

a greater purpose because they provide for the safety of employees (Rahman Dep, 58:6-59:20;

Lashley Dep. 39:24-41:7), allow Verizon to meet its customer service commitments (Rahman

Dep. 211:22-212:17), and keep the business running smoothly (*id.* at 232:6-233:25).

**IV.    Procedural Background**

On November 14, 2013, Plaintiffs filed the instant lawsuit.  (Dkt. No. 1.)  On March 11,

2014, Plaintiffs filed their written consent forms "opting" into the action.  (Dkt. Nos. 18; 19.)  On

November 17, 2014, Verizon filed its motion for partial summary judgment as to Plaintiffs'

individual claims and memorandum in support of same.  (Dkt. Nos. 104; 106)  The same day,

Plaintiffs' filed their Motion. (Dkt. Nos. 100; 102.)

**ARGUMENT AND CITATION OF AUTHORITY**

In deciding a motion for summary judgment, a court must draw "all justifiable

inferences . . . in favor" of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986).  Summary judgment must be denied "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Id.* at 248.  Indeed, "[a]ny evidence in the

record of any material fact from which an inference could be drawn in favor of the non-moving

party precludes summary judgment."  *Scott v. SSP Am.*, 09-CV-4399 (RRM) (VVP), 2011 U.S.

Dist. LEXIS 32819, at * 17 (E.D.N.Y. Mar. 29, 2011) (citing *Castle Rock Entm't, Inc. v. Carol

Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).  Here, Plaintiffs seek summary judgment

regarding the applicability of the HCE, executive, and administrative exemptions.  But Plaintiffs

cannot meet their burden because the evidence conclusively demonstrates that Plaintiffs meet all

of the requirements of the HCE, executive, and administrative exemptions.[12] At the very least, Verizon has created genuine issues of disputed material fact regarding each element of the exemptions at issue, and therefore Plaintiffs' Motion should be denied.

I.    **The Court Must Deny Plaintiffs Summary Judgment As To The HCE Exemption Because Verizon Has Demonstrated That Plaintiffs Meet This Standard.**

Plaintiffs first move for summary judgment regarding the HCE exemption as to their FLSA and NYLL overtime claims, but they cannot succeed because the evidence shows that Plaintiffs meet the exemption criteria. The HCE exemption applies to employees with a total annual, non-discretionary compensation of $100,000, with a primary duty that *includes* performing office or non-manual work, who "customarily and regularly perform[] *any one or more* of the exempt duties or responsibilities of an executive, administrative, or professional employee. . . ." 29 C.F.R. § 541.601(a)-(d) (emphasis added). The duties inquiry is far less demanding under the HCE exemption compared to other exemptions because the "high level of compensation is a strong indicator of an employee's exempt status." 29 C.F.R. § 541.601(c).

Verizon demonstrated in its motion for partial summary judgment (Dkt. No. 106, at 11-14) that Haas meets the HCE exemption from 2009 to present and Rahman from 2010 to present because (1) their total annual compensation exceeded $100,000 in such periods; (2) their primary duty includes performing office or non-manual work; and (3) they regularly and customarily direct their teams of technicians and/or perform duties directly related to the management or general business operations of Verizon. Accordingly, the HCE exemption is dispositive in Verizon's favor, not Plaintiffs. Further, as established herein, considering the record as a whole, there are additional independent grounds to deny Plaintiffs' Motion as to the HCE exemption because Plaintiffs meet the relaxed HCE duties analysis as to each of the elements of the

---

[12] As Plaintiffs note (Motion at 5, n.1), New York Labor Law applies the same overtime exemptions as the FLSA. 12 N.Y. Comp. Codes R. & Regs. § 142-2.2. Accordingly, Verizon's arguments in opposition to Plaintiffs' Motion apply equally to both their federal and state law claims.

executive and administrative exemptions or, at a minimum, a disputed issue of material fact exists in this regard.

### A.   Haas Meets the HCE's $100,000 Threshold From 2009 to Present and Rahman Meets It From 2010 To Present.

To satisfy the HCE exemption compensation requirement, an employee's total compensation within a "52-week period" (such as a calendar year) must be at least $100,000. 29 C.F.R. §§ 541.601(a), (b)(1). Such total annual compensation "must include at least $455 per week paid on a salary or fee basis"[13] and "may also include commissions, nondiscretionary bonuses, and other nondiscretionary compensation earned during [the] 52-week period." *Id.* at § 541.601(b)(1). As to bonuses, FLSA regulations provide that non-discretionary bonuses are the rule and discretionary bonuses are the exception because bonuses are deemed to be discretionary only if the employer "retain[s] discretion *both* as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid." *See* 29 C.F.R. § 778.211(b) (emphasis added). The conjunctive rather than the disjunctive nature of this inquiry is determinative. Indeed, the regulations specifically address incentive bonuses that are "announced to employees to induce them to work more steadily or more rapidly or more efficiently" as well as bonuses for "quality" of work as examples of non-discretionary bonuses. *See* 29 C.F.R. § 778.211(c). Once announced, even if the amount is not set, the employer has "abandoned his discretion with regard to it." *Id.* at § 778.211(b).

Applying this analysis, courts have found incentive pay awards to be non-discretionary. *See, e.g., Gonzalez v. McNeil Techs., Inc.*, No. 1:06cv204, 2007 U.S. Dist. LEXIS 27262, at *13 (E.D. Va. Apr. 11, 2007) (concluding that "[t]he clear thrust of [29 U.S.C.S.] § 207 is that once a bonus is promised to an employee as an inducement to achieve some business goal, even if that

---

[13] Plaintiffs meet the salary basis test underlying the HCE, executive, and administrative exemptions (*see* Declaration of Arlene Preston, Dkt. No. 108 ("Preston Dec.") ¶ 5; Ex. B; Declaration of Paul Olson, Dkt. No. 109 ("Olson November Dec.") ¶¶ 7-10), which Plaintiffs do not dispute (*see* Motion, at 6).

promise is not a guarantee of payment but contingent on other factors such as the financial state

of the company" it is non-discretionary); *see also Amendola v. Bristol-Myers Squibb Co.*, 558 F.

Supp. 2d 459, 478 (S.D.N.Y. 2008) (stating that the employer established that certain positions

within the proposed FLSA class met the HCE's compensation requirement because they earned

more than $100,000 in "base salary plus incentive compensation").

 As Verizon fully demonstrated in its motion for partial summary judgment (Dkt. No. 106,

at 11-14), Haas meets the $100,000 threshold from 2009 to present and Rahman does so from

2010 to present.  Verizon will not repeat this analysis, but rather incorporates it by reference.

 For their part, Plaintiffs concede (Motion, at 6) that they meet the HCE's $100,000

threshold for the years 2011 to present, but dispute this point (Motion, at 27-28) for years in

which it is necessary to include Plaintiffs' incentive pay (VIP award) as part of their total annual

compensation to meet the $100,000 threshold because they claim the pay is "discretionary."

However, Plaintiffs fail to create even a genuine issue of disputed material fact in this regard,

much less demonstrate entitlement to summary judgment on this point.  Significantly, Plaintiffs

fail to offer any legal support for this argument.  They also fail to dispute that the incentive pay

award itself, the timing of the payment, and the corresponding criteria were announced in

advance.  (*See* Preston Dec. ¶¶ 9-14).  Instead, they point to the testimony of Lashley that he

gave input into one of the components that determine the amount of the payment (Motion, at 28),

but that does not render the incentive payment discretionary where the incentive pay award was

announced to employees in advance through written policies.  *See* Preston Dec. ¶¶ 9-14; 29

C.F.R. § 778.211(c); *Gonzalez*, 2007 U.S. Dist. LEXIS 27262, at *13.

 **B. Plaintiffs' Primary Duty Includes Performing Office Or Non-Manual Work.**

 The HCE exemption "applies only to employees whose primary duty *includes* performing

office or non-manual work." 29 C.F.R.  § 541.601(d) (emphasis added).  Plaintiffs meet this

requirement as well.  The FLSA regulations do not define non-manual work, but instead distinguish it from manual work which is expressly defined within the HCE exemption as work "involving repetitive operations with . . . [an employee's] hands, physical skill and energy."  *Id.* Examples of manual work include work performed by "*non-management* production line workers and *non-management* employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, [and] laborers." *Id.* (emphasis added.)  On the other hand, examples of non-manual work include communicating with and motivating others. *See Savage v. Unite Here*, No. 05 Civ. 10812 (LTS)(DCF), 2008 U.S. Dist. LEXIS 32219, at **16-17 (S.D.N.Y. Apr. 17, 2008) (union organizer qualified for the administrative exemption even though much of her job entailed fieldwork such as "communicat[ing] with, recruit[ing], and motivat[ing] workers" in organizing campaigns or in preparation for collective bargaining agreement negotiations because it was nonetheless work "of a very different type than the work that the regulations characterize as 'manual' in nature").

The fact that an employee's work is performed primarily outside an office does not change this analysis.  *See id.* at **15-16 ("fieldwork is not necessarily 'manual' work"). Accepting this reasoning, this Court has cited decisions from other jurisdictions concluding that a myriad of work primarily performed "in the field" as opposed to an office is non-manual.  *See id.* (collecting cases).

### 1.    The Evidence Establishes That Plaintiffs' Primary Duty Includes Office or Non-manual Work.

The evidence before the Court allows for no inference other than that Plaintiffs' primary duty *includes* performing office or non-manual work.  Not only do they each manage a team of 23 unionized technicians and carry out a variety of managerial responsibilities on a daily basis (*see supra* 4-14), but they are precluded by the unionized environment in which they work from

performing the type of manual labor addressed by the FLSA regulations (Lashley Dec. ¶ 7).

Indeed, Plaintiffs' own testimony establishes that their primary duty plainly *includes* performing

office or non-manual work (*see supra* 4-14), and Plaintiffs' descriptions of their duties in their

resumes reinforces this point (*see supra* 11-13).  In fact, a reasonable jury could return a verdict

for Verizon based upon this evidence alone (*see supra* 11-13).

> **2.     Plaintiffs' Arguments To The Contrary Are Unavailing.**

As an initial matter, Plaintiffs fundamentally misstate the HCE exemption requirements

in claiming (Motion, at 6, 14) that the employee's primary duty "must be" the performance of

office or non-manual work.  This argument omits a critical distinction  – namely that the HCE

exemption applies to employees "whose primary duty *includes* performing office or nonmanual

work." 29 C.F.R. § 541.601(d) (emphasis added).  In rejecting a similarly flawed argument, the

court in *Hick's* explained that, due to the "streamlining" of the HCE exemption duties analysis,

there is a "vast difference between fully determining an employee's 'primary duty' as part of the

[white collar] exemption analysis and simply determining whether that primary duty '*includes*

performing office or non-manual work.'"  *Hicks v. Mercedes-Benz U.S. Int'l, Inc.*, No. 7:08-CV-

0536-LSC, 2012 U.S. Dist. LEXIS 60221, *7-9 (N.D. Ala. April 30, 2012).  Indeed, "subsection

(d) [of the HCE exemption] simply clarifies what should be obvious:  that employees who

'customarily and regularly' perform one or more exempt duties must necessarily have some

'office or non-manual work' included as part of their primary duty." *Id.* at *8.  Accordingly, the

rigorous "primary duty" analysis Plaintiffs advocate (Motion, at 7-8, 16) is contrary to law.

Plaintiffs also attempt to portray themselves as "inspectors" (Motion, at 1-2, 7-8, 14-16)

who perform non-manual, clerical duties.  This argument likewise fails.

*First*, no jury could mistake that Plaintiffs' "inspector" depiction of their work is at odds

with how Plaintiffs have described their primary duty from the outset of this litigation.  Plaintiffs

do not use the term "inspector" in their Complaint, but rather describe themselves as Local

Managers responsible for "overseeing a team of technicians" (Dkt. No. 1, ¶ 43) and as

"information liaisons" with the primary job duty of "relaying information back and forth

between technicians and management" (*see id.* at ¶ 37).  Try as they might to re-write the record,

Plaintiffs are bound by their pleading obligations.  *See Bellefonte Re Ins. Co. v. Argonaut Ins.

Co.*, 757 F.2d 523, 528-29 (2d Cir. 1985) ("A party's assertion of fact in a pleading is a judicial

admission by which it normally is bound throughout the course of the proceeding. . . .  [T]he

district court properly disregarded Universal's affidavits seeking to controvert its own pleading."

(citations omitted)); *Clarke v. JPMorgan Chase Bank, N.A.*, 08 Civ. 2400 (CM)(DCF), 2010

U.S. Dist. LEXIS 33264, at *38 (S.D.N.Y. Mar. 26, 2010) ("[I]t is well established that a party

cannot contradict its own pleading with affidavits." (internal quotation marks omitted)).

 *Second*, Plaintiffs cannot negate their deposition admissions through subsequent

affidavits.  *See Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this

circuit that a party's affidavit which contradicts his own prior deposition testimony should be

disregarded on a motion for summary judgment."); *F.D.I.C. v. Wrapwell Corp.*, No. 93 CIV 859

(CSH), 2002 WL 14365, at **16-17 (S.D.N.Y. Jan. 3, 2002) (granting motion to strike portions

of affirmation due to "inconsistencies between [affiant's] deposition and affirmation testimony").

Plaintiffs' contradictions are numerous and egregious.[14]

---

[14] *Compare* Affidavit Testimony: Other Local Managers and I inspect the technicians' work by following Verizon's procedures and checklists. The checklists are extremely specific and my role is to answer each of the questions posed on the checklist.  (Declaration of William Haas ("Haas Dec.") ¶ 8; Declaration of Akhlaqur Rahman ("Rahman Dec.") ¶ 6) *with* Prior Sworn Deposition Testimony: "[Local Managers] are following a checklist to make sure that [technicians are] working safely." (Haas Dep. 73:19-21); "The checklists are what keeps the techs accountable. So I do that." (Haas Dep. 209:21-22); "Q. And by doing the quality observations, you're providing feedback as to how the tech is doing vis-a-vis the quality standards that the company has . . . ? A. That's correct." (Rahman Dep. 68:5-10); "Q: If you observed something unsafe in the field when you're doing one of these observations, do you understand it's your responsibility to follow up with the tech and say something about it? A. Yes. Q. And do you do that? A. Yes." (Rahman Dep. 62:9-16). "Q: [D]o you talk to technicians in the field when you see a problem with their quality? . . . . A. I would tell them, yes." (Rahman Dep. 71:19-23).

 *Compare* Affidavit Testimony: My duties require that I keep a specific area of the garage clean at all times and for cleaning store rooms and other areas of the garage.  On various occasions, I am required to physically clean technicians' trucks.  I have also had to move furniture and remove debris from the garage.  (Haas Dec. ¶ 13; Rahman

*Third*, because all reasonable inferences must be drawn in Verizon's favor in deciding

Plaintiffs' Motion, Plaintiffs' resume admissions about their managerial job duties (*see supra* 11-

13) must be considered notwithstanding their strenuous arguments to the contrary (Motion, at 28-

30).  It certainly would be reasonable for a jury to conclude that Plaintiffs were accurately

characterizing their jobs in their resumes and mischaracterizing them here to gain an unfair

_____

(continued…)

Dec. ¶¶ 11, 12, 13) *with* Prior Sworn Deposition Testimony:"Q. Isn't [cleaning trucks] the job of a technician? A. Yes. . . . . Q. How often would you say that you're cleaning out a truck on a weekly basis? A. Not often." (Haas Dep. 227:15-228:17); "Q: How often have you [cleaned out a storage room] . . . in the course of your position from 2007 to present? A. Four or five times." (Hass Dep. 229:7-20) Q.  Now, is it the techs' responsibility . . .to be making sure that they put equipment away. . .? . . . . A. Yes, it is. Q. And how much time does that take out of your day to look to see if the area is tidy? A. Maybe fifteen minutes." (Rahman Dep. 54:11-55:16); "Q. So how many times would you estimate you've had to clean out a truck year to year? A. Maybe five to seven times a year. . . . Q. And how much time does it take you to clean out a truck? A. . . . [U]sually like an hour or so, average time." (Rahman Dep. 234:10-235:22); "Q. How often have you had to throw out furniture?  A. On occasion." (Rahman Dep. 238:4-6)

   *Compare* Affidavit Testimony: I also perform clerical work such as doing routine paperwork and data entry in Verizon's computer systems.  (Haas Dec. ¶ 14; Rahman Dec. ¶ 14) *with* Prior Sworn Deposition Testimony: "Q. Is it fair to say that all the data entry you described is related to what you need to do as a Local Manager to ensure that techs are meeting their commitments? . . . . [I]sn't it related to what the techs accomplished? A. It's related . . . yes." (Rahman Dep. 242:3-25); "We have to input our safety observations, . . . the quality, . . . our truck inspections, . . . . [and] attendance information . . . . . Q. So you're doing this data entry in relation to what goals the techs are supposed to be meeting? . . . [O]ne of their objectives relates to their attendance, right? A. . . . Yes . . . Q. Isn't it a requirement . . . that techs keep their trucks in order? A. Yes. . . . Q. And someone has to watch to see if they're actually keeping their trucks in order? A. Yes. Q. And that responsibility is yours? A. Yes." (Haas Dep. 223:24-227:11)

   *Compare* Affidavit Testimony:  Any involvement I have in discipline of technicians is as a conduit of my Area Manager who evaluates and makes the final discipline decisions along with his bosses and Labor Relations.  I merely relay information regarding incidents to my supervisors.  (Haas Dec. ¶ 22, Rahman Dec. ¶ 22) *with* Prior Sworn Deposition Testimony: "Q. Do you appreciate that that is the initiation of discipline when you bring it to your Area Manger's attention? A. Yes . . ." (Rahman Dep. 213:22-214:2); "Q. . . . You started the process of . . . this particular tech, being disciplined by reporting it; correct? A. Well, because he reported to me, yes." (Rahman Dep. 202:3-7); "Q. [H]ave you thought of any circumstance when you've recommended a specific level of discipline for a tech? A. . . . . I would opine that the case . . . is strong while conducting the fact finding."  (Haas Dep. 185:19-188:10); "Q.  Did you, in fact, suspend Mr. Springer without pay for abuse of management? A. I suspended him without any thought to pay . . . . Q. And you didn't check with your Area Manager before you suspended him did you? A. No." (Haas Dep. 155:21-156:23); "Q. Now . . . Mr. Jackson received a one-day suspension for abuse of management.  You issued that suspension? A. Again, I would tell him that he's going home. . . . . Q. So based upon you sending Mr Jackson home, sending Mr. Springer home, do you understand that you're administering the code of conduct in doing that? A. Yes."  (Haas Dep. 160:8-18; 162:24-163:4).

   *Compare* Affidavit Testimony: My presence is sometimes required by my Area Manager at a technician's Step 1 grievance meetings. (Haas Dec ¶ 26.; Rahman Dec.¶ 25) *with* Prior Sworn Deposition Testimony: "Q. So do you know pursuant to the CBA whose responsibility it is to sit a first step grievance? A. I believe it has to be at least two first level managers, two Local Managers."  (Haas Dep. 193:6-15); "Q. So it's two Local Managers at the first step? A. Yes.  Q. On behalf of the company? A. Yes.  . . . . Q. [Y]ou've sat in on how many first step grievances . . . ? A. Hundreds of them." (Rahman Dep. 116:3-118:15); "Q. You had to provide some information to your Area Manager at the very least [in a grievance]? A. Yes   . . . .Q.  When one of your tech grieves, are you in the best position to know what occurred? A. I would have [a] lot more information on the particular situation, yes." (Rahman Dep. 203:25-206:5).

   Other examples of Plaintiffs contradicting their own testimony are addressed in Verizon's Response to Plaintiffs' Local Civil Rule 56.1 Statement of Undisputed Facts, filed with Verizon's opposition to Plaintiffs' Motion.

advantage in the litigation as opposed to mischaracterizing their duties in their resumes to get an unfair advantage in job searches and accurately characterizing them here.  This is especially the case given that Rahman paid a professional resume developer $325 – after initiating this lawsuit – to prepare a resume for him that details his management duties.  Notably, O'Brien testified that nothing in Rahman's resume would have been included "if it had not come up and had in some form of conversation been represented" (O'Brien Dep. 58:20-60:11), and testified that Rahman never described his work as "clerical" or "manual" (O'Brien Dep. 60:12-61:9).

*Fourth*, Verizon sharply disputes Plaintiffs' characterization of their duties as inspection work, which in and of itself defeats summary judgment.  Plaintiffs' job, first and foremost, is to manage their team of technicians.  (Lashley Dep. 23:4-21.)  As managers they "drive [their technicians'] performance" (Lashley Dep. 50:9-51:2), which necessarily includes performing safety and quality observations, but this work is necessary to evaluate technicians, to ensure their safety, and for Plaintiffs to "get[] to the right formula to motivate their teams" (*id.* at 209:11-210:7).  Neither Haas nor Rahman referred to themselves as "inspectors" during their depositions, but even if they had, their work is plainly distinguishable from that of nonexempt inspectors.  In *Hicks v. Mercedes-Benz U.S. Int'l, Inc.*, No. 7:08-CV-0536-LSC, 2012 U.S. Dist. LEXIS 91969 (N.D. Ala. July 3, 2012), the court addressed this very issue, and in finding the plaintiffs exempt under the HCE exemption, distinguished plaintiffs' quality checking work from ordinary inspection work because "the focus of [the plaintiff's] inspecting [was] the performance of his group." *Id.* at *19.  The plaintiffs in *Hicks* testified that the purpose of their quality checking was "to make sure that the team members are doing what they are supposed to do." *Id.* at *24.  This is exactly what Plaintiffs do here.  (Lashley Dep. 23:4-21; Lashley Dec. ¶¶ 23-25.)

*Fifth*, any so-called "manual" or "clerical" work that Plaintiffs claim they perform is either limited in nature and/or linked to their management responsibilities.  For example,

Plaintiffs claim (Motion, at 16) that they clean garages, trucks and storage rooms, and throw away trash, and move boxes and cable equipment, but this is the technicians' responsibility (Lashley Dec. ¶¶ 52-53) and, to the extent Plaintiffs do perform such tasks, they testified that they take only marginal amounts of time.  (Haas Dep. 227:12- 229:20; Rahman Dep. 234:5-235:22; 236:4-237:8.)  Plaintiffs additionally claim (Motion, at 16) that they deliver supplies to technicians in the field, but again, maintaining equipment/inventory is a technicians responsibility, and therefore such tasks are an exception to their typical duties. (Lashley Dep. 238:11-25; Haas Dep. 229:21-230:19; Lashley Dec. ¶ 51.)  Plaintiffs further claim (Motion, at 2) that they input data into Verizon's systems, but Plaintiffs admit this is to manage technicians' performance. (Haas Dep. 223:24-227:11; Rahman Dep. 240:9-243:7.)  Therefore, even if such work viewed in isolation could be considered manual, it is directly and closely related to Plaintiffs' exempt work.  *See* 29 C.F.R. § 541.703(a) ("Work that is 'directly and closely related' to the performance of exempt work is also considered exempt work" and may include "physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly").

*Sixth*, given the unionized environment and the fact that there are no fewer than 130 technicians in the Hollis garage reporting to six different Local Managers under Area Manager Lashely, no reasonable jury could conclude that Plaintiffs perform only "ordinary inspection work."  With Lashley "rarely" in the field (Haas Dep. 233:19-235:5), it defies logic that Verizon would allow its unionized technicians to work unsupervised.

*Finally*, *Zubair* and *Switzoor* are inapplicable here.  Both cases involved plaintiffs working for engineering firms in an "inspector" job title in a non-management capacity with responsibilities regarding New York State Department of Transportation projects.  *See Zubair v. EnTEch Eng'g P.C.*, 808 F. Supp. 2d 592, 595 (S.D.N.Y. 2011); *Switzoor v. SCI Eng'g, P.C.*,

No. 11 Civ. 9322 (RA), 2013 U.S. Dist. LEXIS 129994, at **2-3 (S.D.N.Y. Sept. 11, 2013).  As

such, the "paint inspection services on DOT projects" at issue in those cases (*see Switzoor*, 2013

U.S. Dist. LEXIS 129994, at *9, n. 3) bear no resemblance to Plaintiffs' responsibilities in

managing a team of unionized technicians here, including their "driv[ing]" technicians'

performance (Lashley Dep. 23:4-21; 50:9-51:2) to meet operational objectives for which

Plaintiffs admit they are held accountable (Rahman Dep. 86:13-87:3; 135:4-138:22).

Furthermore, in *Zubair*, the defendant employer argued that plaintiff met the HCE

exemption based upon duties of the professional employee exemption (29 C.R.F. § 541.300),

thus eliminating any detailed discussion as to whether plaintiff was a "management" employee

who performs office or non-manual work  (*see Zubair*, 808 F.Supp.2d at 599-600), which is the

issue here.  As to *Switzoor*, Plaintiffs point to dicta in a footnote (Motion, at 2), but dicta should

not dictate the outcome of this case and *Switzoor* did not even involve an overtime exemption

analysis.  *Switzoor*, 2013 U.S. Dist. LEXIS 129994, at **4-5.

### C.    Plaintiffs Meet The Relaxed HCE Duties Inquiry.

"The very purpose of the highly compensated employee exemption is to 'eliminat[e] the

need for a detailed analysis of the employee's job duties.'"  *See Hicks v. Mercedes-Benz U.S.*

*Int'l Inc.*, 2012 U.S. Dist. LEXIS 60221, at *21 (quoting 29 C.F.R. § 541.601(c)).  Because

Plaintiffs meet the HCE's duties requirement if they customarily an regularly perform *any one* of

the exempt duties of an executive or administrative employee exemptions, this provides at least

five different independent opportunities for them to do so.  29 C.F.R. § 541.601(a).

### 1.    Plaintiffs Customarily And Regularly Direct Their Technicians.

Verizon's motion for partial summary judgment (Dkt. No. 106, at 16-21) established that

Plaintiffs  customarily and regularly direct their technicians.  Courts have held that this

"directing the work" prong of the executive exemption is met if employees have responsibility

for matters such as "ensuring [employees'] compliance with policies and procedures" and evaluating employees. *See Baldwin v. Trailer Inns., Inc.*, 266 F.3d 1104, 1116-17 (9th Cir. 2001); *see also Ramos v. Baldor Specialty Foods, Inc*, 10 Civ. 6271(RMB), 2011 WL 2565330, at *6 (concluding that plaintiff directed the work of other employees as part of his management duties, in part, because the "main part" of his job was to "mak[e] sure his [P]ickers [were] doing their job correctly"); *Hicks v. Mercedes-Benz U.S. Int'l Inc.*, 7:08-cv-0536-LSC, 2012 U.S. Dist. LEXIS 91253, at *82 (N.D. Ala. July 2, 2012) (finding that various plaintiffs met the "directing work" requirement based upon evidence that plaintiffs were responsible for enforcing company policies and ensuring that goals were met by their teams).

Here, consistent with *Baldwin, Ramos*, and *Hicks*, Plaintiffs manage their technicians' performance by evaluating and assessing their work and determining how to best improve performance and otherwise ensuring that technicians abide by Verizon policies and procedures is central to Plaintiffs' management tasks (Lashely Dec. ¶ 18-22, 25, 30), which satisfies this prong.

Indeed, Plaintiffs' testimony itself establishes that Plaintiffs direct their technicians. "Mak[ing] sure the techs are performing" (Rahman Dep. 32:8-33:7) consistent with company objectives and in line with company polices is precisely what Plaintiffs do – and what they admit that they do – day in and day out.  (Haas Dep. 105:18-106:22; 108:8-110:4, 106:12-108:7; 120:4-121:3; 119:19-121:3; Rahman Dep. 90:10-93:16; 185:13-188:10; 185:13-188:10; *see also* Lashley Dep. 209:11-210:17; Lashley Dec. ¶¶ 19-21; *supra* 4-9.)

### 2. Plaintiffs Perform Duties Directly Related to Management Or General Business Operations.

As demonstrated in Verizon's motion for partial summary judgment (Dkt. No. 106, at 21-23), Plaintiffs meet the HCE duties test for the additional reason that their work is directly related to Verizon's management or general business operations. Work that is "directly related to the management or general business operations of the employer" is work "directly related to

- 25 -

assisting with the running or servicing of the business, as distinguished, for example from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).  Work in various "functional areas" such as "quality control" and "personnel management" constitutes work directly related to management or general business operations.  29 C.F.R. § 541.201(b).

The hallmark of administrative work is that it is "concerned with *how* [the] business is performed, rather than simply performing it."  *Hicks v. Mercedes-Benz United States Int'l, Inc.*, 7:08-cv-0536-LSC, 2012 U.S. Dist. LEXIS 93708, at **38-39 (N.D. Ala. July 6, 2012).  Work that is directly related to the "management or general business operations" of the employer include, for example, ensuring that work is performed safely, on time, and/or satisfactorily to the customer.  *See Wade v. Werner Trucking Co.*, No. 2:10-CV-270, 2014 WL 1091707, at *23 (S.D. Ohio March 18, 2014) (plaintiffs' work qualified as quality control or personnel management where plaintiffs acted as fleet coordinators overseeing truck drivers "to ensure that deliveries were completed safely and on time"); *Pieretti v. Dent Enters.*, No. 11-2179, 2013 U.S. Dist. LEXIS 27244, at *7 (E.D. Pa. Feb. 27, 2013) (plaintiff quality assurance manager satisfied the test because the plaintiff's "main duties consisted of ensuring that the services the [subcontractors] rendered to [Defendant's] customers were satisfactory"); *Puentes v. Siboney Contracting Co.*, No. 11-80964-CIV, 2012 WL 5193417, at *5 (S.D. Fla. Oct. 19, 2012) (concluding that dispatchers of a trucking services company satisfied the business operations element where their responsibilities included taking "daily orders from the customers, coordinat[ing] and schedul[ing] the truckers, overs[eeing] the truckers, visit[ing] job sites daily, . . assur[ing] that the trucking work was done correctly to the satisfaction of the customers, and handl[ing] any problems or emergencies that arose in the field").

Here, Plaintiffs' work clearly satisfies this prong of the administrative exemption.  (*See supra* 13-14.)  Specifically, Plaintiffs ensure that technicians are performing their jobs safely, that they are working efficiently, and that they are delivering a quality product in a satisfactory manner to customers.  (Lashley Dec. ¶¶ 18, 23; Rahman Dep, 58:6-59:20; 211:22-212:17; 232:6-233:25; Lashley Dep. 39:24-41:7.)  Further, Rahman's role in initiating and overseeing a "call back" program "to address [the] high rate of repeat calls . . . result[ed] in [a] reduction of 3.2% . . . within one year, improved customer quality and lower[ed] costs to the business." (Rahman Dep. Exs. 1, 2, 10, at VZ001206.)  And Haas contributes to business operations in his labor relations role. (*See* Haas Dep. Ex. 22, at Haas000158 (listing "Labor Relations Coordinator" as one of his job duties); Haas Dep. Ex. 11, at VZ001091 (noting that Haas was "instrumental in the handling of grievances"); Haas Dep. Ex. 12, at VZ001093 (noting that Haas "continues to handle all union related issues in the work center"); Haas Dep. Ex. 13, at VZ001095 (same); Haas Dep. Ex. 14, at VZ001113 ("Bill is the Labor SME and sits with me at second step grievances.")  This work is critical to Verizon' overall success (Lashley Dec. ¶ 21), and is the exact type of work that the above-referenced courts have held satisfy this prong of the administrative exemption.

For these reasons, the HCE exemption is dispositive in Verizon's favor, not Plaintiffs. However as demonstrated below (*infra* 27-39), Plaintiffs meet all the other prongs of the executive and administrative exemptions (or a disputed issue of material fact exists as to each), providing additional independent bases upon which to deny Plaintiffs' Motion.

## II.   Plaintiffs Have Failed To Show That Summary Judgment Is Warranted As To The Executive Exemption.

Plaintiffs also move for summary judgment as to the executive exemption under the FLSA and NYLL.  Plaintiffs, however, fall well short of their burden to demonstrate the absence of a genuine issue of fact as to whether (1) their "primary duty is [the] management of the

enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; (2) they "customarily and regularly direct[] the work of two or more other employees"; and (3) their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § 541.100.

A.      **Plaintiffs' Primary Duty Is Management**[15]

Primary duty means "the principal, main, major or most important duty that the employee performs," the determination of which "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a). Factors include "the relative importance of the exempt duties,"  "the employee's relative freedom from direct supervision," and "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  *Id.*

In determining the primary duty, "nothing . . . requires that exempt employees spend more than 50 percent of their time performing exempt work."  29 C.F.R. § 541.700(b).  Exempt management work includes, but is not limited to, training employees, directing work, appraising employees' performance, handling employee complaints and grievances, disciplining employees, apportioning the work among the employees, providing for the safety of employees, and monitoring or implementing legal compliance measures.  29 C.F.R. § 541.102.  Included in exempt work is all work "directly and closely related" to exempt work, such as "spot check[ing] and examin[ing] the work of subordinates to determine whether they are performing their work properly and whether the product is satisfactory. . . ."  29 C.F.R. §  541.703(b)(3).

"[R]ecordkeeping;" "using the computer to create documents;" and "observing" work to determine its "effectiveness" and to "check[]" on the quality of customer service being given"

_____

[15] It is undisputed that Plaintiffs' teams of technicians constitute a "customarily recognized subdivision" for purposes of the executive exemption.  29 C.F.R. § 541.100(a)(2); *Ramos,* 2011 U.S. Dist. LEXIS 66631, at *19-20.

are specifically cited within the FLSA regulations as additional examples of work directly and closely related to exempt work and thus also exempt. *See generally* 29 C.F.R. § 541.703; *see also Perkins v. Southern New England Tel. Co.*, No. 3:07-CV-967 (JCH), 2012 U.S. Dist. LEXIS 18943, at * 13 (Feb. 14, 2012) (denying plaintiffs' motion for judgment as a matter of law or, in the alternative, for a new trial, stating that defendant "presented ample evidence that plaintiffs performed various management activities including observing, reviewing, and working to improve the quality of the work of technicians assigned to the plaintiffs; handling customer complaints or other issues; ensuring the safety of their technicians; assessing their technicians' performance; and giving technicians feedback in order to approve [sic] their productivity"). In examining the primary duty, "many courts look to a manager's training, evaluation, and factors affecting eligibility for bonuses and pay raises." *Mayne-Harrison v. Dolgencorp, Inc.*, No. 1:09-CV-42, 2010 WL 3717604, at *20 (N.D. W.Va. Sept. 17, 2010) (collecting cases).

Plaintiffs' most important duty is to manage their technicians. (Lashley Dec. ¶ 5, 16-21.) Specifically, Plaintiffs manage their technicians' performance to ensure that they work safely and efficiently and provide a quality product that meets customer service standards. (Haas Dep. 73:19-21; Rahman Dep. 58:6-59:20; 67:10-68:10; 211:22-212:17; Lashley Dec. ¶ 16, 18-23.) Ensuring that technicians' meet their objectives assists Verizon in its overall business objectives. (Lashely Dec. ¶ 18-21, 23; Haas Dep. 114:12-25; Rahman Dep. 67:15-68:10; 211:22-212:7; 232:6-233:25.) As Local Managers, Plaintiffs must use their managerial discretion to best determine how to motivate their teams, address and correct deficiencies, ensure that they have the proper amount and types of jobs and work with dispatch to reapportion work as necessary, direct technicians throughout the day by answering questions and approving deviations from jobs, disciplining technicians or initiating the disciplinary process as necessary, and participating in the grievance process. (Lashley Dec ¶¶ 19, 25, 30-36, 40-44; Lashley Dep. 23:4-21; 205:10-23;

225:19-23; *supra* 4-9.)  Furthermore, Plaintiffs are trained to act as managers (Lashley Dec. ¶ 49;

Haas Dep. 253:9-255:9; Haas Dep. Ex. 21) and evaluated based upon supervisory criteria as well

as how successfully they have managed their technicians to meet objectives.  (Lashley Dec. ¶ 47;

Exs. O-Q).  As such, Plaintiffs' primary duty is management.  *See Ramos*, 2011 U.S. Dist.

LEXIS 66631, at *18-19 (finding management to be plaintiffs' primary duty where named

plaintiff testified that the "main part" of his job was to "manage" his team by "mak[ing] sure his

[reports were] doing their job correctly"); *see also Scott*, 2011 U.S. Dist. LEXIS 32819, at *24

("The evidence in the record . . . demonstrates that [plaintiff's] managerial duties were more

important to the success of Defendant's business than other duties she performed during the

course of her employment."); *Baudin v. Courtesy Litho Arts, Inc.*, 24 F. Supp. 2d 887, 892 (N.D.

Ill. 1998) ("The employee's primary duty is that which is of principal importance *to the*

*employer*") (emphasis added) (internal quotation marks omitted).

       Here, Plaintiffs' own testimony further establishes that their job "as a whole" is

management.  Indeed, it is undisputed (*see supra* 4-9) that Plaintiffs are responsible for their

technicians' performance regarding objectives in the areas of safety, quality, efficiency, and

customer satisfaction, which standing alone confirms management as their primary duty.  *See*

*Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) ("Ensuring that company

policies are carried out constitutes the very essence of supervisory work" (internal quotation

marks omitted)).  The fact that the unionized work environment prohibits Local Managers from

performing the same work as their technicians (Lashley Dec. ¶ 7; Lashley Dep. 111:4-25) only

highlights this point.  *See Wilbur v. Silgan Containers*, No. 2:06-CV-02181-MCE-EFB, 2008

U.S. Dist. LEXIS 72804, *18 (E.D. Cal. Aug. 18, 2008) ("That the collective bargaining

agreement expressly prohibited production supervisors from doing production (non-exempt

work), coupled with Plaintiff's awareness of this prohibition, further supports a finding that his

duties were predominately managerial (exempt).")

Plaintiffs' admission that they carry out their duties in the field relatively free from direct supervision (Rahman Dep. 245:16-246:8; Haas Dep. 233:19-235:5) reinforces this point (*see* 29 C.F.R. § 541.700(a)) as does their ability to suspend technicians on the spot without pay and without prior approval for egregious behavior (Lashley Dec. ¶¶ 35-36). But regardless, "[n]othing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of [her] management duties in order to be deemed an executive." *Burson v. Viking Forge Co.*, 661 F. Supp. 2d 794, 801 (N.D. Ohio 2009) (internal quotation marks omitted); *see also Burger King Corp.*, 672 F.2d at 227 (assistant manager exempt although "she was unable to make any significant or substantial decisions on her own").

Given this background, Plaintiffs' argument (Motion, at 16, 23) that their "primary duty" and most important duty is "inspection work" is simply implausible. (*See supra* 4-9.; Rahman Dep. 62:9-16; 69:24-71:23; Lashley Dep. 40:20-42:2) In any event, Plaintiffs' own testimony, performance evaluations, resumes, and testimony from Verizon's managers create, at the very least, a genuine issue of disputed fact on this issue that precludes summary judgment in Plaintiffs' favor. (*See supra* 4-14; Haas Dep. 154:15-169:11; Rahman Dep. 32:8-33:7; 185:13-188:10; Lashley Dec. ¶ 5, 16-21, 47; Exs. O, P, Q; Rahman Dep. Exs. 1, 2; Haas Dep. Exs. 22, 24; Lashley Dep. 23:4-21; 205:10-23; 225:19-23.)

Additionally, Plaintiffs' apparent argument (Motion at 24-25) that Plaintiffs must perform some specific number of management duties outlined within the regulations must be rejected because there is no such requirement. *See e.g., Grace v. Family Dollar Stores, Inc.*, 845 F. Supp. 2d 653, 659, n.12 (W.D.N.C. 2012) ("An employee need not perform all management duties listed in the regulations, or evenly regularly perform such duties, in order to be considered an exempt executive.").

For their part, Plaintiffs purport to deny that management is their primary duty, but this just underscores the factual disputes that preclude summary judgment.[16]

Moreover, Plaintiffs' focus (Motion, at 17) on the CBA, dispatch center, and Workplace Attire Guidelines does not demonstrate that Plaintiffs' primary duty is something other than management. In fact, similar arguments have been rejected time and again. *See Scott*, 2011 U.S. Dist. LEXIS 32819 at **42-45 (collecting cases). In particular, the Second Circuit has dismissed this flawed reasoning by acknowledging that "judgments must still be made" even where companies "seek[] to limit likely mistakes in judgment by issuing detailed guidelines." *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982).

Finally, although the regulations also address consideration of the "relationship between

---

[16] Plaintiffs state that they "do not direct or plan the work or employees," but this ignores Lashley's testimony that directly contradicts this point (Lashley Dep. 59:19-65:13), and Plaintiffs' own acknowledgements that they need to ensure their technicians receive a full day's work (Rahman Dep. 32:8-33:7; Haas Dep. 173:19-176:13); communicate with Dispatch to reassign work when technicians are absent or cannot complete assigned work (*id.*); and direct the work of technicians who are required to call them to obtain approval for any work deviation (Haas Dep. 222:25-223:23; 309:22-310:13).

Plaintiffs state that they "do not appraise employees' productivity or efficiency for the recommending promotions or other changes in status," but it is undisputed that they do assess technicians productivity as part of their "scorecared" objectives (Haas Dep. 117:8-118:8; 119:19-121:3; Rahman Dep. 90:10-91:7), and Plaintiffs complete formal appraisals for their technicians based upon their performance metric results from which a final rating is derived that affects whether technicians are eligible for transfers and promotions (Lashely Dec. ¶ 13; Lashley Dec. Ex. A, at VZ000224-225; Ex. B, at VZ032482.)

Plaintiffs state that they "do not handle employee complaints or grievances;" however, this directly contradicts the language of the CBA (Lashley Dec. ¶¶ 10-11; Ex. A., at VZ00041; Ex. B, at VZ032245); Lashley's testimony (Lashley Dec.¶¶ 10-12, 40-41), grievance meeting records (Lashley Dec. Ex. L), and their own deposition testimony (Haas Dep. 193:6-15; 94:15-96:14; Rahman Dep. 116:3-118:15.)

Plaintiffs state that they "do not discipline employees," but this again directly contradicts Lashley's testimony (Lashley Dec. ¶¶ 35-36), disciplinary records (Lashley Dec. Exs. G-I), and Haas' testimony (Haas Dep. 154:15-169:11), and omits the fact that both Plaintiffs administer policies and initiate the disciplinary process (Haas 213:3-214:2; 162:24-163:4; Rahman Dep. 161:6-165:10; 199:16-202:7; 209:9-211:21).

Plaintiffs state that they "do not apportion the work among employees," choosing to focus on the role the dispatch center plays in technician work assignments but neglecting to explain that they frequently must contact dispatch to reapportion work when it cannot be completed as planned. (Haas Dep. 173:19-176:13; Lashely Dec. ¶¶ 42-43.)

Plaintiffs state that they do not "provide for the safety . . . of the employees," but Lashley clearly stated that they do (Lashley Dec. ¶ 23) and Rahman acknowledged that this is an express purpose of the safety work observations they complete. (Rahman Dep. 58:6-59:20.)

Finally, Plaintiffs state that they do not "monitor . . . legal compliance measures," yet Lashley stated otherwise (Lashley Dec. ¶ 49) and Haas testified that he has completed training related to the ADA and ensures that his technicians receive a break for lunch (Haas Dep. 253:9-255:9; 151:19-152:8).

the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee" (29 C.F.R. § 541.700(a)), that analysis is inapposite here because Plaintiffs admit (Haas Dep. 171:15-172:17; Rahman Dep. 26:23-27:5; 30:14-22) that they do not perform the "kind of nonexempt work performed by" the technicians they supervise (*see* 29 C.F.R. § 541.700(a); *Pippins v. KPMG LLP*, 921 F. Supp. 2d 26, 43 (S.D.N.Y. 2012) (comparison appropriate where "same kind of nonexempt work" is performed); *see also Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 918 (E.D. La. 2009) (comparison appropriate to "someone doing the nonexempt work [plaintiff] regularly performed"). Indeed, the comparison is particularly unfitting here because the technicians' compensation is set through collective bargaining that does not apply to Local Managers. (Lashley Dec. ¶¶ 6-7.)

### B. Plaintiffs Customarily & Regularly Direct The Work Of Two Or More Employees.

As explained above (*supra* 4-14, 28-33), and in Verizon's motion for partial summary judgment (Dkt. No. 106 at 16-21), Plaintiffs satisfy this prong as a matter of law. At the very least there is a genuine issues of disputed material fact that defeats Plaintiffs' motion.

Against all this evidence, Plaintiffs are grasping at straws by arguing (Motion, at 25-26) that they do not direct employees because they only "rearrange" work and do not train employees. This position is squarely contradicted by the evidence, including from Plaintiffs themselves that established work rules for unionized employees require technicians to contact their Local Manager for approval before deviating in any way from their planned work day (Haas Dep. 222:25-223:23; Lashely Dec. ¶ 44; Ex. N.).

### C. Plaintiffs' Suggestions and Recommendations on Change of Status Are Given Particular Weight.

Plaintiffs also satisfy the requirement that their "suggestions or recommendations" as to the "change of status" of employees is given "particular weight." 29 C.F.R. § 541.100(a)(4).

- 33 -

Importantly, "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105.

Although disciplinary decisions may be reviewed for consistency in Verizon's unionized environment, it is undisputed that Plaintiffs initiate the disciplinary process by raising technicians' infractions to Area Manager Lashley. (Haas Dep. 213:22-214:2; Rahman Dep. 199:16-202:7) And, Plaintiffs make disciplinary recommendations, including recommendations regarding suspensions, which are highly valued because Plaintiffs are in the position closest to the technicians, their performance history, and the behaviors at issue. (Lashley Dec. ¶ 34; Ex. G; Haas Dep. 185:19-188:14.) This is sufficient to show that Plaintiffs meet this final prong of the executive exemption. *See Scott*, 2011 U.S. Dist. LEXIS 32819, at *51 ("Plaintiff's authority to recommend suspensions and to initiate disciplinary process against the unionized, hourly employees is sufficient to show that her recommendations and suggestions as to changes in employment status . . . were given particular weight."); *Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp. 2d 1010, 1016 (E.D. Mich. 2005) (concluding that supervisor's suggestions were given particular weight where they "typically initiated the progressive disciplinary process set forth in the collective bargaining agreement").

Furthermore, Plaintiffs' affect technicians "change of status" with respect to promotions because their coaching and evaluations of technicians throughout the year culminates in technicians' final performance rating and, pursuant to the CBA, without an overall satisfactory rating, technicians are not "eligible to apply for placement." (Lashley Dec. ¶ 13; Ex. A, at VZ000224-225, Ex. B, at VZ032482.) Local Managers also provide input regarding technician candidates being considered for promotion. (Quadrino Dep. 48:24-49:22.)

For their part, Plaintiffs falter in arguing (Motion, at 26) that discipline "is governed" by the CBA and requires input from Plaintiffs' managers and Verizon's Labor Relations Department because the law only requires that employee's suggestions be given "particular weight," which Plaintiffs' plainly are (Lashley Dec. ¶ 34), and "an employee's suggestions . . . may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status."  29 C.F.R.§ 541.105; *see also Scott*, 2011 U.S. Dist. LEXIS 32819, at **44, 50 ("[T]here is often a hierarchy in any organization wherein supervisors have persons to whom they must report, and the fact that an individual does not have final supervisory authority does not take person out of the realm of being a manager in the organization;" concluding that plaintiff met this prong where he could suspend employees without advance approval in extreme or dangerous circumstances, but "normally" would only make the recommendation (internal quotation marks omitted)).

In sum, there is more than sufficient evidence to create genuine issues of disputed fact as to each prong of the executive exemption under both the FLSA and NYLL.  Therefore, Plaintiffs' Motion as to this exemption must be denied.

**III.   Plaintiffs Have Failed To Show That Summary Judgment Is Warranted As To the Administrative Exemption.**

Plaintiffs additionally move for summary judgment as to their administrative exemption under the FLSA and NYLL.  Here again, however, Plaintiffs' Motion fails because the evidence demonstrates that Plaintiffs meet this exemption, but at the very least, the evidence creates genuine issues of disputed material fact as to each element.

### A.    Plaintiffs' Work Is Directly Related To the Management Or General Business Operations of Verizon.

As established in Verizon's motion for partial summary judgment (Dkt. No. 106, at 21-23) and above (*see supra* 13-14, 25-27), Plaintiffs' work is directly related to the management or general business operations of Verizon as a matter of law.  *See* 29 C.F.R. § 541.200(a)(2).

Contrary to their contention (Motion, at 3), Plaintiffs do not need to "run Verizon's business" to meet the administrative exemption.  Instead, the exemption requires only that employees perform work related to "*assisting with* the running or servicing of the business."  29 C.F.R. § 541.201(a) (emphasis added.)

Plaintiffs likewise err in relying on *Davis v. J.P. Morgan Chase*, 587 F.3d 529, 535 (2d Cir. 2009), which Plaintiffs cite to support their position that an employee cannot meet the administrative exemption if he/she has "no involvement in determining future strategy or direction of the business" or does not "perform any other function that in any way relate[s] to the business's overall efficiency or mode of operation" is easily distinguishable from this case.[17] Significantly, the court in *Davis* relied upon the administrative/production dichotomy to analyze the work of the plaintiff underwriters and concluded that they "produce[d] the services – loans – that [were] 'sold' by the business to produce its income."  *Id.* at 537.  In the instant case, however, it is the technicians, not the Local Managers, who "produce the service" – the installation and maintenance of the voice, data, and television offerings – that are "sold" by Verizon.  In *Davis*, the court acknowledged this distinction by contrasting a case that found "marketing representatives charged with cultivating and supervising an independent sales force" to be exempt administrative employees because "their primary duties of . . . organizing the sales

---

[17] Plaintiffs also selectively quote these statements without regard for the decision as a whole, but regardless, a genuine issue of disputed material fact exists regarding whether Plaintiffs' work "is related to [Verizon's] overall efficiency or mode of operation" because, as Rahman testified, the work of the Local Managers ensures that the business runs "smoothly."  (Rahman Dep. 232:6-233:25; *see also* Lashley Dec. ¶¶ 21, 23.)  Thus, *Davis* supports the exempt status of Plaintiffs here.  (*See supra* 14-15; 26-28.)

people were aimed at promoting . . . customer sales generally not routine selling efforts.  *Id.* at 536 (internal quotation marks omitted).

   **B.    Plaintiffs Primary Duty Includes The Exercise of Discretion and Independent Judgment As To Matters Of Significance.**

   Plaintiffs also plainly satisfy the exercise of discretion and independent judgment prong of the administrative exemption.  *See Pieretti*, 2013 U.S. Dist. LEXIS 27244, at *8 (a quality assurance manager exercised discretion and independent judgment where his "main job duties included conducting independent assessments of" subcontractors' work performance, "making recommendations to management based on those assessments, . . . developing corrective action plans for deficient CPs, . . . [and] evaluating possible courses of conduct, such as ways in which to approach any deficiencies in the work performance of the CPs"); *Rooney v. Town of Groton,* 577 F. Supp. 2d 513, 534-35 (D. Mass. 2008) (police officer exercised discretion and independent judgment where he made "judgment calls" regarding the work of his subordinates, "exercise[d] discretion in directing the work of subordinate employees, supervise[d] employees under him, . . . and discipline[d] other police officers, action which involve[d] discretion because he [was] required to determine whether a sanction [was] appropriate and how to administer the discipline"); *see also Williamson v. Cook Composites & Polymers Co*., No. CV 08–8069 AHM (VBKx), 2009 WL 4730887, at *7 (C.D. Cal. Dec. 7, 2009) (finding, under California executive exemption, which unlike FLSA and NYLL, requires exercise of discretion and independent judgment, that plaintiff's testimony "firmly established" he met the criteria where he, among other tasks, ran daily morning meetings and had the authority to adjust schedules throughout the day to meet deadlines).

   Likewise, Plaintiffs here exercise discretion and independent judgment.  They conduct assessments of the technicians' performance, determine the best method of approaching technicians to improve their performance (which may be informal coaching, developing a

performance improvement plan, or referring a technician for more training), decide how to reallocate work if technicians cannot complete their jobs on time or encounter a problem, discipline technicians or provide input into such decisions, attempt to resolve grievances, and determine (or recommend) whether the company should pay regarding customer damage complaints.  (Lashley Dec. ¶¶ 19-20, 25, 34, 40-43, 50; Ex. L; Lashley Dep. 112:11-117:10.)  Plaintiffs' testimony confirms this.  (Haas Dep. 106:12-107:9; 120:4-121:3; 309:22-310:13; Rahman Dep. 165:12-171:20; 178:23-179:5; 189-:4-192:18; Lashley Dec. Ex. R), This is also reinforced by the fact that Plaintiffs perform their work in the field outside the presence of Lashley (Rahman Dep. 245:16-246:8; Haas Dep. 233:19-235:5) and thus are "relatively free[] from direct supervision" (*see* 29 C.F.R. § 541.202(c)).  Moreover, this work is critical to Verizon's overall success as company.  (Lashley Dec. ¶ 21.)

Plaintiffs' argument (Motion at 21) that their work is "routine" and "repetitive" is flatly contradicted by the record evidence.  (Lashley Dec. ¶¶ 19-20, 25, 33-34, 42-44; Haas Dep. 154:15-169:11; 172:18-173:14; 173:19-176:13; 185:19- 188:14; 259:24-262:8; 309:22-310:13; Rahman Dep. 32:8-33:7; 62:9-16; 69:24-71:23; 74:20-75:19; 159:21-160:4; 193:13-196:15; Lashley Dep. 32:9-33:3; 34:20-36:4; 38:22-43:9; 59:19-70:8; 94:19-95:21; 100:20-101:14; *see supra* 4-14.)  Plaintiffs' argument (Motion, at 22) that Verizon's policies and procedures constrain Plaintiffs to the point that they do not exercise discretion and independent judgment also misses the mark.  To begin with, the policies and procedures that Plaintiffs cite to govern technician conduct, and Plaintiffs' job is to enforce them.  (Lashley Dec. ¶¶ 22-24, 30, 37-39.)  Moreover, the record contains overwhelming evidence that Plaintiffs exercise discretion and independent judgment notwithstanding the guidelines applicable to their managerial work.  (Haas Dep. 154:15-169:11; 172:18-173:14; 223:16-23; 259:24-262:8; 309-22:310:13; Rahman Dep. 189:4-192:18; 193:13-196:15; Lashley Dep. 34:20-36:24; 40:2-42:2; 59:19-70:8; 94:19-95:21;

100:20-101:14; 138:4-139:15; 112:11-113:13; 138:4-139:15; 112:11-113:13; 158:2-19; Lashley

Dec. ¶¶ 19, , 21, 25, 31, 33-34, 37-38, 40-45, 50; *see supra* 4-9.)  As previously addressed (*see

supra* 32) courts routinely reject this argument.  *See Burger King Corp.*, 675 F.2d at 521-22;

*Scott*, 2011 U.S. Dist. LEXIS 32819 at **42-45 (collecting cases).  Finally, the cases Plaintiffs

cite (Motion, at 11-12; 21) are inapposite because they were decided in distinctly different

factual contexts.  *See* 29 C.F.R. § 541.202(b) (stating that the "phrase 'discretion and

independent judgment' must be applied in light of all the facts involved in the particular

employment situation in which the question arises").  As an initial matter, the Court in *Pippins v.

KPMG*, 759 F.3d 235 (2d Cir. 2014) was not analyzing the administrative exemption but rather

considering whether the professional employee exemption applied to audit associates.  *Harper v.

GEICO*, No. 13–4479–cv, 2014 WL 5066492 (2d Cir. Oct. 10, 2014), is similarly off-point

because there the court's analysis regarding insurance claims adjusters focused on criteria

specific to such positions as outlined in 29 C.F.R. § 541.203(a).  *In re Novartis*, 611 F.3d 141 (2d

Cir. 2010), likewise is of limited applicability in this case because the pharmaceutical sales

representatives had no role in managing employees as Plaintiffs do here.  There is no

requirement that Plaintiffs meet the *same* examples of discretion and independent judgment

discussed in *Novartis.  See* 29 C.F.R. § 541.202(b).

Here too, there is more than sufficient evidence to create genuine issues of disputed fact

as to each prong of the administrative exemption under both the FLSA and NYLL.  Thus,

Plaintiffs' Motion as to this exemption must be denied as well.

## CONCLUSION

For the reasons set forth above, Verizon respectfully requests that the Court deny

Plaintiffs' Motion.

Dated:  December 8, 2014

Respectfully submitted,

s/ Tonya Braun
Matthew W. Lampe
Kristina A. Yost
JONES DAY
222 East 41st Street
New York, New York 10017
Tel: 212.326.3939
Fax: 212.755.7306
mwlampe@jonesday.com
kyost@jonesday.com

Tonya Braun (*admitted pro hac vice*)
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, Ohio 43215
Tel: 614.469.3939
Fax: 614.461.4198
tbraun@jonesday.com

*Attorneys for Defendant Verizon New York Inc.*